**UNPUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

———————

**No. 05-1731**

———————

SCOTTSDALE INSURANCE COMPANY, INCORPORATED,

Plaintiff - Appellee,

versus

NATIONAL CENTER ON INSTITUTIONS AND
ALTERNATIVES, INCORPORATED,

Defendant - Appellant.

———————

Appeal from the United States District Court for the District of
Maryland, at Baltimore.  William D. Quarles, Jr., District Judge.
(CA-04-2356-WDQ)

———————

Submitted:  February 14, 2006          Decided:  March 3, 2006

———————

Before KING and SHEDD, Circuit Judges, and HAMILTON, Senior Circuit
Judge.

———————

Affirmed by unpublished per curiam opinion.

———————

Gary R. Jones, Adam H. Garner, BAXTER, BAKER, SIDLE, CONN & JONES,
P.A., Baltimore, Maryland, for Appellant.  David B. Stratton,
JORDAN, COYNE & SAVITS, L.L.P., Washington, D.C., for Appellee.

———————

Unpublished opinions are not binding precedent in this circuit.
See Local Rule 36(c).

PER CURIAM:

The National Center on Institutions and Alternatives, Inc. ("NCIA"), appeals the district court's award of summary judgment to Scottsdale Insurance Company ("Scottsdale"). Scottsdale initiated this civil action in the District of Maryland in July 2004, seeking a declaratory judgment that an insurance policy it had issued to NCIA is void ab initio. On June 7, 2005, after discovery proceedings, the court granted summary judgment to Scottsdale. As explained below, we affirm.

The facts, viewed in the light most favorable to NCIA, disclose the following. In 1995, at the request of his mother, the State of Maryland placed Mark Hepburn, a developmentally disabled adult, in a residential facility operated by NCIA.[1] In December 1996, Hepburn was evaluated by the Athelas Institute, Inc. ("Athelas"), a Maryland non-stock corporation that is not affiliated with NCIA, for placement in a daytime vocational program. Hepburn began attending the vocational program in early 1997. In order for him to participate, a van would take Hepburn from NCIA's facility to that of Athelas each weekday morning, and then return him in the afternoon. Although NCIA and Athelas are

_____

[1]NCIA is a non-profit corporation that focuses on providing rehabilitative and other services to non-violent criminal offenders. It has offices and treatment centers in Maryland, Virginia, Pennsylvania, and New York.

2

separate organizations, their respective representatives participated in quarterly meetings concerning Hepburn's status.

On September 29, 1999, while at the Athelas facility, Hepburn choked on part of a bologna sandwich. The incident left him in a persistent vegetative state and prompted an investigation by the Developmental Disabilities Administration ("DDA"), a Maryland state agency. On March 6, 2000, following its investigation, DDA sent NCIA a "Notice of Intent to Impose Intermediate Sanctions" (the "DAA notice"), asserting that NCIA was aware of prior choking incidents involving Hepburn, but had nevertheless failed to advise Athelas that he required one-on-one supervision while eating. The DAA notice stated that NCIA had contravened Maryland regulations in connection with the Hepburn choking incident. It informed NCIA that DAA intended to impose sanctions on NCIA as a result of such violations. According to NCIA Executive Director Herbert Hoelter, a notice of sanctions from DDA is unusual, and upon receipt of the DAA notice he became concerned that NCIA could be liable for Hepburn's injuries. DDA and NCIA thereafter settled the Maryland administrative proceedings by a Consent Agreement, entered into on May 8, 2000.

On June 15, 2001, NCIA applied to Scottsdale for a one-year claims-made general and professional liability insurance policy (the "Initial Policy"). By executing a Retroactive Date Endorsement for the Initial Policy, NCIA represented to Scottsdale,

3

through Hoelter, that it "could not have reasonable foreseen that any prior acts or incidents might be the basis of any claim or 'suit.'" Relying on NCIA's representations, Scottsdale issued the Initial Policy, which was effective from July 2001 until July 2002. On July 19, 2002, NCIA applied to renew the Initial Policy's coverage, with the renewal to be effective from July 30, 2002, until July 30, 2003. By Question 12 on the renewal application, Scottsdale asked "[a]re there any circumstances known which may give rise to a claim or lawsuit." NCIA, through Hoelter, checked the answer "No." The renewal application was then approved by Scottsdale, which issued a renewal policy (the "Renewal Policy").

On November 4, 2002, NCIA informed Scottsdale that Hepburn's mother had sued NCIA, on behalf of her son, for damages stemming from the 1999 choking incident. On June 11, 2003, Scottsdale forwarded NCIA a letter stating that it would defend NCIA in the litigation involving the Hepburn claim. Scottsdale specifically reserved its right, however, to disclaim any duty to indemnify or defend NCIA if Scottsdale later discovered that NCIA knew or could have foreseen, when it applied for the Renewal Policy, that it might be sued on Hepburn's behalf. Scottsdale's letter also informed NCIA that Scottsdale was initiating a coverage investigation of the Hepburn claim. On July 21, 2004, Scottsdale sent NCIA a letter of rescission on the Renewal Policy, and

4

tendered to NCIA a check for over $89,000, the amount of the premiums NCIA had paid thereon.

On July 22, 2004, NCIA acknowledged receipt of Scottsdale's rescission letter and advised Scottsdale that it would place the refunded premiums in a trust account, pending resolution of this declaratory judgment proceeding. That same day, Scottsdale initiated this action, seeking a judgment declaring the Renewal Policy to be void ab initio, and that Scottsdale was not responsible for defending or indemnifying NCIA in litigation on the Hepburn claim. By its complaint, Scottsdale contended that NCIA made material misrepresentations on its applications for the Initial Policy and the Renewal Policy in failing to disclose the Hepburn choking incident. On March 4, 2005, following discovery proceedings, Scottsdale moved for summary judgment, which the district court granted by its Memorandum Opinion and Order of June 7, 2005. Scottsdale Ins. Co. v. Nat'l Ctr. on Insts. and Alternatives, No. CA-04-2356, 2005 WL 1367079 (D. Md. June 7, 2005). NCIA has timely noted an appeal, and we possess jurisdiction pursuant to 28 U.S.C. § 1291.

We review de novo an award of summary judgment, viewing the facts and inferences drawn therefrom in the light most favorable to the non-moving party. See Seabulk Offshore, Ltd. v. Am. Home Assurance Co., 377 F.3d 408, 418 (4th Cir.2004). Such an award "is appropriate only 'if the pleadings, depositions, answers to

5

interrogatories, and admissions on file, together with the affidavits, . . . show that there is no genuine issue of material fact and that the moving party is entitled to a judgment as a matter of law.'" Id. (quoting Fed. R. Civ. P. 56(c)) (alteration in original).

The parties agree that Maryland law governs any legal issues relating to the Renewal Policy. And, in Maryland, an insurance policy may be voided ab initio if it was issued in reliance on a material misrepresentation. See N. Am. Specialty Ins. Co. v. Savage, 977 F. Supp. 725, 728 (D. Md. 1997). NCIA's contends on appeal that a genuine issue of fact exists concerning whether it made such misrepresentations when it asserted (1) that there were not "any circumstances known [to NCIA] which may give rise to a claim or lawsuit," and (2) that it "could not have reasonable foreseen that any prior acts or incidents might be the basis of any claim or 'suit.'" NCIA acknowledges that these representations were material to Scottsdale's policy issuance decisions, and that Scottsdale relied on them in issuing the Renewal Policy. Moreover, NCIA does not contend that Hoelter was unaware of the Hepburn choking incident when he made representations for NCIA on the relevant policy applications.

NCIA's asserts that the policy applications called for NCIA to subjectively determine whether it thought a future civil action was likely. It contends that, although the relevant limitations period

6

had not expired, the facts relating to the Hepburn choking incident could give rise to a reasonable inference that, by July 2001, Hoelter and NCIA reasonably believed that no legal actions would result from the incident. Question 12 on NCIA's renewal application, however, did not require NCIA to speculate as to the likelihood that some event, such as the Hepburn choking incident, might lead to a future lawsuit. Rather, it asked whether there were "any circumstances known [to NCIA] which may give rise to a claim or lawsuit." NCIA acknowledges on appeal that the word "may," as used in Question 12, means "might possibly." See Reply Br. at 3. As a result, NCIA was required to answer "Yes" to Question 12 if it knew of circumstances that might possibly give rise to a claim or lawsuit. At the time Question 12 was answered in connection with the Renewal Policy, NCIA knew of the Hepburn Choking Incident and, from the DAA notice of March 2000, that it might be liable for Hepburn's injuries. NCIA was, in these circumstances, aware that a claim or lawsuit might possibly arise out of the Hepburn choking incident. In face of such knowledge, NCIA incorrectly answered "No" on Question 12.

Accordingly, the district court did not err in concluding that there is no genuine issue of fact on whether NCIA made a material misrepresentation upon which Scottsdale relied in its issuance of

7

the Renewal Policy.  We are thus obliged to affirm the court's award of summary judgment to Scottsdale.[2]

AFFIRMED

---

[2]We dispense with oral argument because the facts and legal contentions of this appeal are adequately presented in the materials before the Court and argument would not aid us in the decisional process.